# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SERGIO E. VALLES,

       Plaintiff,

v.                                                                                      CV 04-468 WJ/WPL

MICHAEL WYNNE,
Secretary, Department of the Air Force,

       Defendant.

## ORDER

      Sergio Valles served as an Operation Research Manager for the Air Force Operational Test and Evaluation Center (AFOTEC). Following Valles' unsuccessful completion of a Performance Improvement Plan, the Air Force removed Valles from his position as Operation Research Manager. This action arises out of Valles' appeal of his removal to the Merit Systems Protection Board (MSPB). For the reasons set forth below, I conclude that substantial evidence exists to support the MSPB's decision.

### BACKGROUND

      At the time of his removal from AFOTEC in January of 2003, Valles had worked as an analyst with the United States Government for approximately 19 years. (A.R. Vol. 9 at 237.) Valles, who holds a bachelor's of science in metallurgical engineering, began his career as a quality and reliability engineering intern trainee with the United States Army in Texarkana, Texas. (A.R. Vol. 9 at 238-39.) Valles remained with the Department of the Army until 1997. (A.R. Vol. 9 at 241.) On February 1, 1997, Valles began working as a general engineer for Philips Laboratory, a division of the United

States Air Force. (A.R. Vol. 9 at 248-49.)

In September of 1997, Valles transferred from Philips Laboratory to the Office of Aerospace Studies to serve as an Operations Research Analyst. (A.R. Vol. 9 at 250.) Valles received his first performance appraisal from his supervisor, Timothy G. Poole, on April 12, 2000. (A.R. Vol. 9 at 257-58; A.R. Vol. 3 Tab 4pp.) In this appraisal, Valles received a "Superior" overall performance rating and a rating of "Far Above Fully Successful" or "Outstanding" in the nine appraisal factors. (A.R. Vol. 3 Tab 4pp.) This appraisal period covered from April 1, 1999 until March 31, 2000. (*Id.*)

On October 1, 2000, Major Darrell Wright replaced Poole as Valles' immediate supervisor. Valles received his first performance evaluation from Wright on October 27, 2000. In this performance evaluation, Wright observed that the unit's reorganization prevented a complete observation of Valles' performance. (A.R. Vol. 3 Tab 4oo.) Wright recommended that Valles take action in the following three specific areas: "1) Document results on investigation into directed energy OT & E methods & shortfalls (Duties 1 & 2) 2) Attend M&S symposium & support AFOTEC 99-102 revision (Duties 3 & 5) 3) Complete VDOP study for AM 9x (Duty-4)." (*Id.*)

Wright's second evaluation of Valles' performance, completed on April 9, 2001, covered the period from October 27, 2000 until March 31, 2001. (A.R. Vol. 3 Tab 4nn.) This evaluation stated that "[a]ll three elements listed on Oct [sic] feedback were not completed." (*Id.*) Wright indicated that Valles needed improvement or significant improvement in several areas, including his progress on performance plan elements, cooperation/responsiveness, organizational skills, communication, duty performance, and thoroughness.[1]  (*Id.*)

---

[1] On August 15, 2001, Valles, in response to the "fully successful" performance evaluation of April 9, 2001, filed an Equal Employment Opportunity complaint alleging age, race, and national origin discrimination. The agency dismissed this complaint on September 10, 2001. On March 20, 2002, the Office

2

On June 1, 2001, Major Jeffrey McDonald replaced Wright as Valles' supervisor. Valles received his first performance feedback from McDonald on October 19, 2001. (A.R. Vol. 7 at 16; A.R. Vol. 3 Tab 4kk.) The Performance Feedback Worksheet of October 19 described Valles as needing "Little Improvement" in his required performance elements. (A.R. Vol. 3 Tab 4kk.) During the administrative hearing, McDonald testified that the October 19 Performance Feedback Worksheet drew from very little knowledge of Valles' work product. (A.R. Vol. 7 at 29.) According to McDonald, during the four months preceding the October 19 evaluation, he "had not seen anything physical that [Valles] had produced or even was given a briefing." (*Id.*)

In the October 19 performance evaluation, McDonald listed several tasks for Valles to complete. First, McDonald asked Valles to "put together a briefing that would outline concerns, areas of interest, concerning directed energy weapons testing and then brief the division on that so we could be brought up to speed on that . . . ." (A.R. Vol. 7 at 30.) Second, McDonald asked Valles to "show me where we were at on the armaments, munitions road map. Because this is basically a yearly cycle and because I was new to the job, I wanted to understand how the cycle worked."[2] (*Id.*)

Following the October 19 performance evaluation, McDonald testified that he observed several key areas of Valles' performance. First, McDonald testified that he never received "a briefing on the [Directed Energy] vision as we discussed in his performance feedback worksheet in October."

---

of Federal Operations reversed the agency's decision and remanded the complaint for processing. Valles filed a second complaint on June 6, 2002 and filed several additional amendments to his EEO complaints through his remaining tenure with the Department of the Air Force. (Doc. 17 at 8; Doc. 19 at 4 & 5.) Because Valles' discrimination claim has been resolved, additional facts relating to Valles' EEO complaint or underlying claims for discrimination will not be addressed in this Order.

[2] The Performance Feedback Worksheet from October 19, 2001 also listed tasks for Valles to complete in the areas of VDOPS and TSIWG. (A.R. Vol. 3 Tab 4kk.)

(A.R. Vol. 7 at 31.) McDonald testified that he "never received any feedback on where we were at in the armaments, munitions road maps . . ." as specified in the October 19 performance evaluation. (*Id.*) Additionally, McDonald testified that he noticed that "Valles relied heavily" on a co-worker's technical knowledge and that Valles' co-worker appeared to have a "better technical understanding of Mr. Valles' work areas than Mr. Valles did." (*Id.* at 31-32.) Lastly, McDonald testified that he noticed that Valles failed to return "any type of feedback on any of those four work areas, the VDOPSS, the LAIRCM, the DE programs, the armaments, munitions. He never came back, which really is - - his role is an awareness in the issues of those, handling those issues and communicating those issues back to myself and the division chief. And that really never happened over the next couple of months." (*Id.*)

At the administrative hearing, McDonald pointed to three specific instances that prompted concern that Valles "may not be able to perform his job duties" and caused McDonald to change his assessment of Valles' performance. (*Id.* at 32-37.) First, Valles, serving in the capacity of project leader for the second phase of a three-phase project, was responsible for preparing a delivery order. Second, Valles "missed the deadline" for submitting a request for funding for the second phase of the project. (*Id.*) Third, as part of his role as project lead, and in preparation for a briefing of a high ranking AFOTEC official, Valles was responsible for updating the test team regarding information related to phase two of the testing project. McDonald testified that in addition to being unaware of the upcoming briefing with the AFOTEC official, when "we actually did the briefing . . . I noticed that Mr. Valles had a considerable problem with articulating the facts or the key information that really the test team needed to know." (*Id.* at 38.)

Following the briefing on January 31, 2002, McDonald returned to his office and "drafted

4

comments regarding [his] observations of Mr. Valles' work performance over the last couple of months . . . ." (*Id.* at 39.) McDonald presented these comments to Valles in a Performance Feedback Worksheet on February 1, 2002. (*Id.* at 39-40; A.R. Vol. 3 Tab 4jj.) In this performance evaluation, McDonald highlighted three major areas of concern. First, McDonald noted that Valles appeared to have a problem working independently without supervisory oversight. (A.R. Vol. 7 at 40; A.R. Vol. 3 Tab 4jj.) Second, McDonald expressed concern that Valles "had a problem distilling facts and information of a technical nature." (A.R. Vol. 7 at 40.) Third, McDonald pointed out that Valles' "briefing skills and [] writing skills needed considerable improvement." (*Id.* at 41.)

Shortly after presenting Valles with this performance evaluation, McDonald, along with Holt, met with Al Carrillo, a representative from the civilian personnel office at the Kirkland base regarding the appropriate procedure through which to place Valles on a performance improvement plan. (*Id.* at 43-44.) Following this meeting, McDonald elected to "issue Mr. Valles an out-of-cycle appraisal and also create a performance improvement plan for him." (*Id.*) In this out-of-cycle performance appraisal, McDonald gave Valles an overall performance rating of "unacceptable." (A.R. Vol. 3 Ex. 4ii.) Moreover, McDonald's evaluation found that Valles "did not meet" three critical elements of his position. (*Id.*)

In addition to the performance evaluation, McDonald placed Valles on a Performance Improvement Plan (PIP). According to McDonald, the PIP, sent to Valles on March 12, 2002, aimed to bring Valles "back up to the standards in terms of his job performance." (*Id.* at 48.) The PIP focuses on "three major areas of concern in [Valles'] work activities . . . . These include an observed inability to work independently, lack of technical competence, and ineffectiveness in communicating both orally and in writing." (A.R. Vol. 3 Tab 4hh.) The PIP assigned Valles two specific tasks. The

5

first assignment directed Valles to prepare an annotated briefing of AFOTEC's test capability for urban targets. (A.R. Vol. 7 Tab 4hh.) The second assignment directed Valles to prepare a talking paper addressing the formulation of AFOTEC's strategy "concerning development of test capability for directed energy weapons testing."[3] (*Id.*)

McDonald held regular feedback sessions with Valles during the PIP.[4] The feedback sessions provided McDonald an opportunity to provide recommendations on how Valles could successfully complete the two tasks and provided a list of several items McDonald advised Valles to include in the final work product.

On August 1, 2002, Valles completed the two tasks under the PIP and provided McDonald with the Urban Targets study and the Directed Energy talking paper. In two separate memoranda, both dated August 19, 2002, McDonald appraised Valles' completion of the PIP. In the memorandum addressing Valles' work on the Urban Targets study, McDonald observed that "[i]t is my overall assessment that although the briefing has some degree of general information regarding urban targets, it failed to demonstrate the stated improvement requested by the PIP." (A.R. Vol. 2 Tab 4l at 11.) Similarly, McDonald, in his evaluation of Valles' Directed Energy talking paper, commented that "although the directed energy talking paper has some merit as a synopsis for the DEOTET study and general information regarding DE test infrastructure, it failed to demonstrate the stated improvement

---

[3] McDonald found Valles deficient in critical elements 1, 2, and 4 of his job performance. The PIP, however, sought improvement only in critical elements 1 and 2 of Valles' job performance. (A.R. Vol. 3 Tab 4ff.)

[4] These feedback sessions took place on March 15, 2002, March 27, 2002, April 5, 2002, April 18, 2002, May 8, 2002, May 23, 2002, and June 4, 2002. The administrative record contains documentation from each feedback session except the session that took place on March 15, 2002. The document from this session should be located at Tab 4gg in Volume 3 of the administrative record but is instead located at Tab 4jj in Volume 3.

requested by the PIP." (A.R. Vol. 2 Tab 4k.)

On September 12, 2002, Valles, McDonald, and Roger C. Ygbuhay[5] met to discuss the three possible courses of action that management would take as a result of Valles' failure to satisfy the requirements of the PIP. (A.R. Vol. 2 Tab 4i.) McDonald and Ygbuhay advised Valles that he would either be transferred, demoted, or removed from duty. (*Id.*) In an independent review of Valles' work product conducted on September 24, 2002, Jeff Erikson, Chief of the Effectiveness Analysis Branch, concluded, "Assuming the package I reviewed reflects an accurate account of assignments, expectations, and feedback given to the employee throughout the PIP period, it appears reasonable the two products assigned were found to be unsatisfactory." (A.R. Vol. 2 Tab 4h.) On October 7, 2002, Valles was given a Notice of Proposed Removal. (A.R. Vol. 2 Tab 4g.) Valles responded to this Notice of Removal on December 8, 2002. (A.R. Vol. 3 Tab 4b.) On January 6, 2003, Valles was removed from service. (A.R. Vol. 3 Tab 4a.)

## PROCEDURAL HISTORY

Following the Department of the Air Force's decision to remove him from his position as a GS-1515-13 Operations Research Analyst within the federal service, Valles filed an appeal with the MSPB. The MSPB affirmed the agency's actions. Valles then filed a complaint in this court asserting claims for age and national origin discrimination, retaliation, and an appeal from the decision of the MSPB. On October 11, 2005, the court granted Defendants' Motion for Summary Judgment on Valles' discrimination claims. (Doc. 24.) The court then entered an Order setting a briefing schedule

---

[5] Ygbuhay replaced McDonald in July of 2002 when McDonald "was reassigned to another directorate within AFOTEC." (A.R. Vol. 7 at 271.) McDonald, however, remained Valles' supervisor during the remainder of the PIP because "McDonald was in the best position to render a fair and knowledgeable assessment of the PIP products. He had the history of observing Mr. Valles for the entire time of his supervision." (*Id.* at 272.)

7

for the parties to address Valles' remaining administrative claim. (Doc. 26.)

## DISCUSSION

In his appeal to the MSPB, Valles argued that he was improperly dismissed for both discriminatory and nondiscriminatory reasons. In "mixed" cases such as this, where the party seeks review of both discrimination and nondiscrimination claims, the court will review the discrimination claims *de novo* and the nondiscrimination claims on the administrative record. *Rivera v. Levitt*, 88 F. Supp. 2d 1132, 1138-39 (D. Colo. 2000). The remaining nondiscrimination claims, therefore, will be reviewed on the administrative record.

"Under Title 5 an agency may remove an employee for 'unacceptable performance,' which 5 U.S.C. § 4301(3) defines as performance that 'fails to meet established performance standards in one or more critical elements of such employee's position.'" *Louie v. Dep't of the Treasury*, 122 F. App'x 449, 451 (Fed. Cir. 2004) (quoting *Lisiecki v. Merit Sys. Prot. Bd.*, 769 F.2d 1558, 1560 (Fed. Cir. 1985)). "Before initiating an action under 5 U.S.C. § 4303, an agency must provide the employee with a reasonable opportunity to demonstrate acceptable performance. If, after a reasonable opportunity, performance is found unacceptable with respect to even a single 'critical element,' an agency may reduce in grade or remove an employee." *Id.*

"The requirements incumbent upon an agency in effecting a proper Chapter 43 removal [] action are to set up an approved performance appraisal system, communicate the written performance standards and 'critical elements' of an employee's position to the employee at the beginning of the appraisal period, warn of inadequacies in 'critical elements' during the appraisal period, and counsel and afford an opportunity for improvement after proper notice." *Martin v. Fed. Aviation Admin.*, 795 F.2d 995, 997 (Fed. Cir. 1986). "To sustain a performance-based removal of an employee, the agency

8

must demonstrate by substantial evidence that it complied with these requirements." *Rivera*, 88 F. Supp. 2d at 1139.

A decision of the MSPB "must be upheld unless the reviewing court determines that it is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule or regulation having been followed; or (3) unsupported by substantial evidence." *Williams v. Rice*, 983 F.2d 177, 180 (10th Cir. 1993) (quoting 5 U.S.C. § 7703(c)). "[J]udicial review of MSPB decisions is very narrow." *Romero v. Dep't of the Army*, 708 F.2d 1561, 1563 (10th Cir. 1983). A reviewing court will "affirm a decision of the Board sustaining the dismissal of a federal employee if the 'decision complies with the applicable statute and regulations and if it has a rational basis supported by substantial evidence from the record taken as a whole.'" *Martin*, 795 F.2d at 997. Substantial evidence is defined as the "degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree." 5 C.F.R. § 1201.56(c)(1).

Valles appears to argue that substantial evidence does not exist to support the administrative judge's findings that: 1) the agency adequately notified Valles of his performance deficiencies and the steps required to remedy such deficiencies; 2) the tasks established in the PIP provided specific goals that Valles could reasonably achieve during the improvement period; and 3) the agency failed to provide specific advance notice of the proposed termination of Valles. Because the administrative judge addressed each of these arguments, and because the administrative judge's decision is

supported by substantial evidence, I conclude that the MSPB's decision must be upheld.[6]

### *Substantial Evidence Supports the MSPB's Finding that Valles Received Adequate Notice of Performance Deficiencies Before and During the PIP*

In his appeal, Valles argues that "neither the initial notice or 'Performance Improvement Plan' nor any of the 'feedback sessions' were adequate to inform Mr. Valles of either what he had done wrong, or how he was to proceed to remedy his alleged deficiencies." (Doc. 27 at 17-18.) Valles contends that he "was unable to understand the reasoning used to describe the alleged deficiencies . . . [and] was unable to understand the steps required of him in order to survive or perform under the plan." (Doc. 27 at 13-14.) Moreover, Valles argues that "[t]he seven or eight meetings that Mr. Valles had with Major McDonald [during the PIP] did not serve to elucidate what was required of him to achieve performance under the Performance Improvement Plan." (Doc. 27 at 14.)

The administrative judge found that both the PIP and the feedback sessions adequately notified Valles of his performance deficiencies and the steps needed to remedy such deficiencies. The administrative judge noted that "[t]he agency placed the appellant on the PIP based on his perceived failure to meet the standards in the first, second, and fourth critical elements" of his position. (A.R. Vol. 1 Tab. 30 at 7.) Moreover, the administrative judge observed that "[t]he instructions for the task to be performed under the first critical element were set forth at length in the document placing the appellant on the PIP." (*Id.* at 10.) According to the administrative judge, "The changes and tasks to be required during the PIP were fully communicated to the appellant in the document placing him on

---

[6] Defendant argues that Valles' failure to file the administrative record with the court should result in the summary dismissal of Valles' administrative claim. (Doc. 31 at 13.) Because I conclude that the MSPB's decision is supported by substantial evidence and that it is not arbitrary, capricious, or contrary to law, I need not address Defendant's argument regarding Valles' failure to file the administrative record with the court.

the PIP and in several feedback sessions between the appellant and his supervisor during the PIP." (*Id.*)

Substantial evidence exists to support the administrative judge's finding that the PIP, as well as the feedback sessions, provided Valles with adequate notice regarding his performance deficiencies and the steps necessary to remedy those deficiencies. *See Louie*, 122 F. App'x at 452 (rejecting employee's argument that the Agency failed to provide specific information concerning the employee's performance deficiencies where "[t]he Agency's [Opportunity to Improve] letter to Louie included a detailed account of his inability to perform at his job including []: (1) the inordinate amount of time [spent] on his audits . . . ; (2) his failure to complete three of four 'Cost of Goods Sold Information Document Request' forms; and (3) his failure to provide his supervisor with comparative 'M-1' and 'M-2' analysis."). The Notice of Performance Deficiencies and Opportunity to Improve, the document placing Valles on the PIP, notified Valles of specific details regarding his performance deficiencies. First, the Notice pointed to Valles' failure to "independently conduct[] any comprehensive analyses of test capability requirements in support of OT&E for AF or DoD weapons systems." (A.R. Vol. 3 Tab 4hh.) The Notice also pointed out that Valles' "written work requires extensive revision and correction and [his] ability to communicate verbally likewise suffers." (*Id.*) Second, the Notice specified that Valles, as the lead "TST analyst for the LAIRCM test program" did not "adequately plan for or effectively analyze the impacts of a possible shortfall that may concern this test program . . . in the area of spatial discrimination of ground based IR simulators." (*Id.*) Third, the Notice pointed out as a deficiency Valles' failure to give "adequate direction to a degree necessary for [the LAIRCM test team] to understand the ramifications of not having a clearly defined test limitation or shortfall." (*Id.*)

Similarly, the Notice informed Valles of the steps required to remedy his performance deficiencies. For example, the Notice instructed Valles that he "must conduct research and interview necessary points of contact among different operational and T&E or training organizations to ascertain the current technologies that are applicable to this domain." (*Id.*) Moreover, the Notice specified that "[t]echnical issues and operational testing requirements for urban targets should be formulated into a clear, logical, and grammatically correct test capability requirements study." (*Id.*)

In addition to the Notice placing him on the PIP, the several feedback sessions conducted throughout the PIP provided Valles with additional notice regarding his performance deficiencies and the steps required to remedy such deficiencies. In a Feedback on Urban Targets Study dated June 4, 2002, McDonald provided detailed recommendations to specific tasks set forth in the PIP and suggestions as to how Valles could tailor his draft to meet those requirements. (A.R. Vol. 2 Tab 4v.) Moreover, McDonald testified that throughout the PIP he "offered suggestions of improvement, of what would make [Valles'] briefing successful." (A.R. Vol. 7 at 70.) For example, McDonald testified that he "gave [Valles] suggestions that he should contact AFOTEC test teams, who are the people who are currently doing the testing, and discuss urban targets with them." (*Id.* at 72.) Such facts provide substantial evidence to support the administrative judge's conclusion that "[t]he instructions for the task to be performed under the first critical element were set forth at length in the document placing the appellant on the PIP" and that the feedback sessions were "detailed and the appellant was given specific suggestions for each task." (A.R. Vol 1 Tab. 30 at 10.)

12

## *Substantial Evidence Supports the MSPB's*
## *Finding that the PIP did not Lack Specificity*

In his appeal, Valles contends that the ambiguity of the tasks set forth in the PIP rendered the PIP's objectives impossible to perform or complete and that the administrative judge's findings to the contrary are not supported by substantial evidence. In support of this argument, Valles refers to the testimony of John Gowan and Natalie Clark. Valles relies particularly on Gowan's testimony that the Urban Targets study was "completely impossible" and that "[n]obody could perform those jobs."(*Id.* at 201.) Gowan also testified that the tasks set forth in the PIP for the Urban Targets study were "overly broad and impossible to do under the conditions that Mr. Valles was given . . . ." (A.R. Vol. 9 at 189-90.) Similarly, Clark testified that the tasks set forth in the PIP were "so broad and so vague, I didn't even know exactly what Sergio was supposed to do." (A.R. Vol. 9 at 126.)

The administrative judge addressed precisely this argument in the MSPB decision. At the administrative hearing, Valles "argued that the parameters of the tasks under the PIP were so broad and vague that he could not understand or grasp the boundaries of the tasks." (A.R. Vol. 1, Tab 30 at 9.) In response to this argument, the administrative judge found "that the task given to the appellant . . . was specific and within reason under his standards and for a person in his position as an Operational Research Analyst." (*Id.*) Moreover, the administrative judge observed that Valles "was given very specific feedback during the PIP, with particular questions and suggestions for inclusion in the urban targets study required under critical element 1, and for avenues of research or the gathering of data for analysis to be incorporated into the urban targets study." The administrative judge also addressed Gowan's and Clark's testimony that the tasks assigned in the PIP were broad and vague. (*Id.*) The administrative judge found that McDonald, who "was involved intimately in the

13

PIP process and had the greatest opportunity to observe the . . . PIP process . . . was the most credible of the four witnesses [] on the reasonableness of the task and whether the appellant satisfactorily completed it." (*Id.* at 14.)

Substantial evidence exists to support the administrative judge's findings. The specific language set forth in the PIP provided sufficient specificity to guide Valles' completion of the Urban Targets study. Moreover, such specific language in the PIP undercuts Gowan's testimony. Gowan testified that the PIP set vague and poorly defined goals and standards and was impossible to complete. Moreover, Gowan testified that with the Urban Targets study "there is no real description or usable or useful definition of what weapon systems he is supposed to look at. I mean, there are some references to a few; but it seems like just taken on its face value, that he could look at just about every possible weapons system that the Air Force has any remote interest in." (A.R. Vol. 9 at 183.) In contrast to Gowan's description of the PIP, the language of the PIP specifies that the improvement plan for Critical Element 1 assigned Valles the "task of formulating recommendations for the division's strategy concerning urban targets as they are applied to armaments and munitions programs as well as EW-related weapon systems that are to be tested by AFOTEC. To be successful, you must thoroughly research and review any current documentation associated with this aspect of test infrastructure capability." (A.R. Vol. 3 Tab 4hh.) Such specific language provides a sufficient guideline for Valles' completion of the PIP and supports the administrative judge's finding that "the task given to the appellant . . . was specific and within reason under his standards and for a person in his position as an Operational Research Analyst." (A.R. Vol. 1 Tab 30 at 9.) Moreover, such specific language reinforces the administrative judge's finding that McDonald, who had "the greatest opportunity to observe the series of events or actions in question which made up the PIP process,"

14

was more credible than Gowan or Clark regarding the reasonableness of the task set out in the PIP. *See Sweeney v. Dep't of Homeland Sec.*, 233 F. App'x 997, 1000 (Fed. Cir. 2007) ("Because the [administrative judge] is in the best position to evaluate credibility, his credibility determinations are virtually unreviewable on appeal . . . and will not be disturbed unless inherently improbable, discredited by undisputed evidence, or contrary to physical facts . . . ." (internal citations and quotation marks omitted)).

Similarly, substantial evidence exists to support the administrative judge's finding that the feedback sessions, while not necessarily able to answer all Valles' questions, "did provide detailed answers and suggestions for the appellant's use in the study." (*Id.* at 13.) *Cf. Miller v. Dep't of the Navy*, 166 F. App'x 479, 480-81 (Fed. Cir. 2005) (upholding agency's rejection of employee's argument "that the standards were vague and that there was a lack of feedback" where, "even though [employee] may not have been given specific feedback in regard to all of his tasks during the PIP period, the agency's conduct was sufficient to satisfy its obligation"). In a feedback memorandum dated April 18, 2002, for example, McDonald stated that "[i]n conjunction with the PIP, I asked Mr. Valles to provide the following items as part of his studies. These are intended to help frame his efforts and give him an 'overall' guidance from which he can depart to accomplish the two tasks." (A.R. Vol. 2 Tab 4y.) These items included: 1) a list of "programs in AFOTEC with possible requirements for urban targets[;]" 2) a list of "service-wide or DoD-wide urban target test or training - including existing or proposed facilities in the Army or Navy w/ POCs[;]" and 3) "[o]utline capabilities of existing facilities for urban targets & MOOTW." (*Id.*) Additionally, in a feedback memorandum dated June 4, 2002, McDonald gave Valles specific comments and recommendations pertaining directly to instructions listed in the PIP. (A.R. Vol. 2 Tab 4v.) Moreover, McDonald raised

15

questions for Valles' consideration and pointed out weaknesses with Valles' initial draft of the Urban Targets study. (*Id.*) Accordingly, both the language of the PIP, as well as the feedback Valles received during the course of the PIP, provide substantial evidence to support the administrative judge's findings that the task given to Valles regarding the Urban Targets study "was reasonable and conformed to his standards and that the task required during the PIP was sufficiently specific, especially given the feedback sessions, to constitute a reasonable standard." (A.R. Vol. 1 Tab 30 at 9.)

### *Substantial Evidence Supports the MSPB's Finding that the Agency Provided Specific Advance Notice Regarding Valles' Proposed Termination*

In his appeal, Valles appears to contend that the lack of "specific reasons" in a notice of a proposed adverse action "will result in reversal of the action if it is determined that the lack of specificity was harmful to the appellant's ability to respond and to defend against the charge." (Doc. 27 at 9.) Valles alleges that the Agency "failed to provide adequate notice of the charges 'by notify[ing] the employee of the conduct with which he is charged in sufficient detail to permit the employee to make an informed reply.'" (Doc. 27 at 9 (quoting *LaChance v. MSPB*, 147 F.3d 1367, 1371 (1998)) (brackets in original).)

In its decision upholding the Agency action, the MSPB rejected Valles' argument that "the agency committed procedural error by failing to provide the appellant with sufficient notice of the bases for the proposed removal." (A.R. Vol. 1 Tab 30 at 17.) In responding to this argument, the MSPB observed, "The proposal letter informed the appellant that he would be removed for unacceptable performance on the first and second critical elements of his standards during the PIP." (*Id.*) The administrative judge further noted:

16

> The notice then sets forth in detail his duties, standards, and the deficiencies in the tasks performed during the PIP. Not only does the document provide notice, it provides very specific and clear notice of the basis for the removal and the deficiencies in the appellant's performance. The appellant argues that it is not sufficiently detailed to enable a meaningful reply. The notice is sufficiently detailed and discusses specifics in the appellant's performance that the agency found wanting. If it does not mention every single deficiency, that is not necessary. The notice alerts the appellant that his removal is based on his unacceptable performance on the tasks assigned during the PIP. It lists in detail some of the deficiencies, which have already been discussed above. That was sufficient notice to enable the appellant to provide a meaningful reply, which in fact he did. He provided a very detailed response to the proposal.

(*Id.*)

Substantial evidence in the administrative record supports this finding. The Notice of Proposed Removal, prepared by Paul Holt, provides detailed notice of the basis of Valles' proposed removal. The Notice of Proposed Removal points to several deficiencies in Valles' performance in completing the Urban Targets study. Holt states that the "product you provided on 1 August 2002 was neither accurate nor current." (A.R. Vol. 2 Tab 4g.) Additionally, Holt identifies as a significant deficiency Valles' failure to address the "current status of funds to develop the High Technology Test & Training Urban Target Complex, or how Air Combat Command (ACC) intended to fund this." (*Id.*) Holt also specifies that Valles' failure to "contact any AFOTEC test team members during the course of the PIP" casts "great doubt on the accuracy and currency of the briefing content." (*Id.*) Lastly, Holt observed that Valles "failed to provide the comprehensive information that was specified in the PIP and feedback sessions." (*Id.*) In light of the detailed discussion of Valles' performance deficiencies, I conclude that substantial evidence supports the administrative judge's findings that the Notice of Removal gave Valles "very specific and clear notice of the basis for the removal and the deficiencies in the appellant's performance." (A.R. Vol. 1 Tab 30 at 17.)

17

## CONCLUSION

For the reasons set forth above, I conclude that the MSPB's decision complies with the applicable statute and regulations and has a rational basis supported by substantial evidence from the record taken as a whole and should therefore be affirmed.

IT IS SO ORDERED.

*[signature: William P. Lynch]*

WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.